RANDAL JOHN LARSON,

      *Plaintiff,*

v.                                  **No. 3:19-cv-261-J-PDB**

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant.*

---

# Order

    Randal Larson brings this action under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying his application for benefits. Under review is a decision by an Administrative Law Judge ("ALJ") dated June 18, 2018. Tr. 25. Summaries of the law and the administrative record are in the ALJ's decision, Tr. 14–25, and the parties' briefs, Docs. 15, 16, and not fully repeated here. Larson contends the ALJ erred in his treatment of medical opinions and Larson's testimony. Doc. 15. The arguments concern only physical impairments.

## I.    Standard

    A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks and alteration omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* "Substantial evidence … is more than a mere scintilla. …

It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

If substantial evidence supports an ALJ's decision, a court must affirm, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

The substantial-evidence standard applies only to factual findings. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). "The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoted authority and alterations omitted).

## II.    Background

Larson alleged he had become disabled on August 26, 2015, from a herniated disc, limited mobility in his neck, severe headaches, fractured vertebras, numbness in his left arm, knee pain, depression, and anxiety. Tr. 87. Most of his physical impairments stem from a June 2013 incident in which he hit his head on a beam at a car dealership, *see* Tr. 447, 619, leading to a January 2014 C3-4 cervical discectomy and fusion, Tr. 371. He continued working as an export manager until August 2015, when he accepted a severance package and left. Tr. 50. He testified his company had given him a severance package because he could no longer satisfactorily perform the job. Tr. 50. He also testified he could read for 30 minutes, lift 10 pounds, walk for 15 minutes at one time, stand for 30 minutes to one hour, sit in an office chair for 30 minutes to one hour, bend to touch his knees but not toes, squat, reach overhead, use buttons and zippers, and sit for about four hours. Tr. 20.

The ALJ found Larson meets the insured-status requirements through December 31, 2020. Tr. 16.

The ALJ found Larson has severe impairments of his cervical and lumbar spine, shoulder bursae, and tendon disorder (among other severe impairments not pertinent here). Tr. 16. The ALJ found Larson does not meet the criteria for any Listing of Impairment, stating:

> For the claimant's cervical and lumbar spine degenerative disc disease, the record does not contain longitudinal medical evidence required by Medical Listing 1.04A of motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss. A neurological examination found grossly intact sensation and strength, steady gait, and normal reflexes (Exhibit 14F, page 31). Physical examinations of the claimant found normal muscle bulk and tone, and 5/5 strength in all muscles (Exhibit 29F, page 7, 10, 13, 16, 19, 22, 25, 28). Straight leg raise test was negative (Exhibit 22F, page 17; 24F, page 41). There is no medical evidence of spinal arachnoiditis confirmed with appropriate laboratory findings. The claimant has not provided evidence of lumbar spinal stenosis, resulting in pseudoclaudication and the inability to ambulate effectively.

Tr. 19.

The ALJ found Larson has the residual functional capacity ("RFC")[1] to perform light work with additional limitations:

> [T]he claimant is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit with normal breaks for a total of about 6 hours in an 8-hour workday, stand and/or walk with normal breaks for a total of about 4 hours in an 8-hour workday, frequently handle and finger with

---

[1]A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The Social Security Administration uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy he can perform. 20 C.F.R. § 404.1545(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). The ALJ need not defer to any medical opinions concerning the RFC. *See* 20 C.F.R. § 404.1527(d)(3).

the left hand, frequently reach overhead with the right upper extremity, frequently climb ramps/stairs, balance and crouch, occasionally stoop and kneel, and never climb ladders/scaffolds, crawl, work at unprotected heights or work with dangerous moving mechanical parts. The claimant is able to tolerate only up to occasional exposure to dust, odors, fumes and other pulmonary irritants.

Tr. 19. The ALJ found Larson could perform his past relevant work as an export manager and therefore found no disability. Tr. 25.

## III. Law & Analysis

### A. *Treating-Source Opinions*

In finding no disability, the ALJ gave minimal or partial weight to opinions by two treating physicians: Robert Kent, D.O., with Orlando Pain Relief Center, and John Flinchbaugh, D.O., with Florida Spine Care.[2] Tr. 23–24. Larson contends good cause does not support the ALJ's treatment of those opinions. Doc. 15 at 7–22.

The Social Security Administration ("SSA") "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c).[3] A medical opinion is a statement from an acceptable medical source that reflects judgment about the nature and severity of an impairment, including symptoms, diagnosis, prognosis, physical restrictions, mental restrictions, and what someone can do despite the impairment. 20 C.F.R. § 404.1527(a)(1).

An ALJ must state with particularity the weight he gives a medical opinion and the reasons for that weight. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Factors to decide the weight include the examining relationship, the

---

[2]Although Drs. Kent and Flinchbaugh provided the opinions, Larson often saw other providers at their offices. *See, e.g.*, Tr. 776, 899.

[3]"For claims filed … before March 27, 2017, the rules in [20 C.F.R. § 404.1527] apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply." 20 C.F.R. § 404.1527. Because Larson filed his claim for benefits before March 27, 2017, *see* Tr. 87, the rules in § 404.1527 apply here.

treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § 404.1527(c). An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011).

The SSA generally will give more weight to the medical opinions of "treating sources"[4] because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). But an ALJ need not give more weight to a treating source's medical opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, the opinion is conclusory, or the opinion is inconsistent with the treating source's own medical records. *Id.* at 1240−41.

An opinion of a non-examining reviewing physician, when contrary to the opinion of an examining physician, is entitled to little weight, and by itself is not substantial evidence. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). But an ALJ may reject any medical opinion if the evidence supports a contrary finding. *Id.* Stated another way, "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

---

[4]A "treating source" is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. § 404.1527(a)(2).

In August 2016, Dr. Kent signed a letter from Larson's attorney summarizing previously discussed limitations. Tr. 716–17. It begins, "This correspondence shall serve to confirm your opinions regarding John Larson's medical condition and causal relationship to his injuries sustained on 6/8/2013." Tr. 716. The letter continues:

> Specifically, Mr. Larson came under your care following an ACDF procedure (C3-4) performed by neurosurgeon John Jenkins on 1/21/2014 secondary to striking his head on an I-beam at a car dealership on 6/8/2013. Despite mild improvement post-surgery, Mr. Larson continues to experience significant headaches, neck pain, cervical radiculopathy and low back pain. Mr. Larson did not improve with post-operative injection therapy and at the present time you have prescribed the following medications [copied with Dr. Kent's handwritten changes]:

> 1. Hydrocon 7.5/325 mg x4 per day (pain control) — ~~narcotic~~ NUCYNTA 100 MG x 2 by
> 2. ~~Hysingla ER 20 mg x1 per day (pain control)~~ (ER) — NARCOTIC
> 3. Amitrptyline 25mg (sleep)
> 4. ~~Indomethacin 50mg x3 per day (pain control)~~
> 5. ~~Tizanidine 2mg x3 per day (muscle spasms / pain control)~~

> You have assigned permanent physical restrictions of no lifting in excess of 5 lbs on a repetitive basis, lifting a maximum of 15 lbs on an occasional basis and no prolonged sitting/standing in excess of 1 hour. In addition, it is your opinion that Mr. Larson is incapable of performing tasks requiring prolonged concentration, focus, executive functions and/or complex thought processes based on his significant pain levels and effects of medications.

Tr. 716. The letter continues,

> Finally, it is your opinion that the 6/8/2013 incident proximately caused Mr. Larson's need for post-operative injection therapy, ongoing pain medications and the resulting permanent restrictions set forth above.

> If this accurately reflects your opinions, please so indicate by your signature below. Otherwise, please make any comments or changes as needed. Also, please estimate the total medical costs Mr. Larson will incur on a yearly basis with his current pain management regimen.

Tr. 717.

In a space for any comments by Dr. Kent under the attorney's signature, Dr. Kent wrote, "Gabapentin 100 mg x 3 per day (pain)"; "Lidocaine patches 5% as needed (pain)"; "Voltaren Gel 1% as needed (pain)"; and "Nugynta 100 mg x 2 (PR) (pain) narcotic." Tr. 717. Under "Estimated Yearly Medical Costs," he wrote "unknown as pain is still not controlled. Mr. Larson is doing everything he can but still has significant pain." Tr. 717. Dr. Kent signed the letter. Tr. 717.

In March 2018, Dr. Flinchbaugh completed a "Physical Residual Functional Capacity Questionnaire." Tr. 956–60. Next to, "Frequency and length of contact," he wrote "5/17/2017 – monthly." Tr. 956. Next to "Diagnoses," he wrote "D/O bursae + tendons in shoulder, DDD cervical spine, cervical fusion syndrome." Tr. 956. Next to "Prognosis," he wrote "undetermined." Tr. 956. He listed symptoms as muscle spasms, neck pain, decreased range of motion, and shoulder pain. Tr. 956. He opined Larson has throbbing and stabbing pain and paresthesia, that pain is increased with activity, and that the pain is "7/10." Tr. 956.

Next to "Identify the clinical findings and objective signs," Dr. Flinchbaugh wrote "spinal fusion cervical C4-C7." Tr. 956. He described treatment as "[left] shoulder cortisone injection x2" and right occipital nerve block and listed medications of Percocet, Mobic, and Robakin. Tr. 956. He checked that Larson's impairments could be expected to last at least 12 months and Larson is not a malingerer. Tr. 957. Under "Do emotional factors contribute to the severity of your patient's symptoms and functional limitations," Dr. Flinchbaugh wrote "No," but under "Identify any psychological condition affecting your patient's physical condition," he checked "Depression." Tr. 957. Under "Are your patient's impairments … reasonably consistent with the symptoms and functional limitations described in this evaluation," he checked "Yes." Tr. 957. He checked that Larson would "frequently" experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform simple work tasks. Tr. 957.

Asked to estimate Larson's functional limitations in a competitive work situation, Dr. Flinchbaugh opined Larson could walk 2 city blocks without resting or experiencing severe pain; could sit for 10 minutes at a time; could stand for 10 minutes at a time; could sit for less than 2 hours in an 8-hour workday; could stand or walk for less than 2 hours in an 8-hour workday; would need periods of walking around, walking for approximately 10 minutes at 15-minute intervals; would need a job that allows shifting at will from sitting, standing, and walking; and would sometimes need to take unscheduled breaks every 15 to 20 minutes for 30 minutes. Tr. 957–58.

Dr. Flinchbaugh checked that Larson's legs should be elevated during prolonged sitting and that Larson could lift less than 10 pounds. Tr. 958. Dr. Flinchbaugh did not answer a question about whether Larson must use a cane or other assistive device while standing and walking. Tr. 958. Dr. Flinchbaugh opined that, because of a cervical fusion, Larson could never look down, turn his head right or left, or look up, and could occasionally hold his head in a static position. Tr. 959. Dr. Flinchbaugh opined Larson could rarely twist, stoop (bend), or climb stairs, and could never crouch (squat) or climb ladders. Tr. 959. Under "Does your patient have significant limitations with reaching, handling or fingering," he checked "Yes." Tr. 959. He opined that, during an 8-hour workday, Larson could use his left hand 25 percent of the day for grasping, turning, and twisting objects; left fingers 25 percent of the day for fine manipulations; and left arm 25 percent of the day for reaching. Tr. 959. Dr. Flinchbaugh marked nothing for the right hand. Tr. 959.

Under "Are your patient's impairments like[ly] to produce 'good days' and 'bad days,'" Dr. Flinchbaugh checked "Yes." Tr. 959. He estimated Larson would miss more than 4 days a month because of his impairments or treatment. Tr. 959. Under "Is your patient unable to maintain a regular work schedule because of pain," Dr. Flinchbaugh checked "Yes." Tr. 960. Under "Is your patient unable to maintain a regular work schedule because of side effects of medication," he checked "No." Tr. 960.

8

Under "Does your patient have to lie down at unpredictable times during the day because of pain," he checked "Yes." Tr. 960.

Asked to describe other limitations that would affect Larson's ability to work at a regular job on a sustained basis, Dr. Flinchbaugh wrote, "[Larson] has cervical fusion which limits his ability to move his head, reach, use hands due to pain/[paresthesia]/[range of motion]." Tr. 960. He opined Larson has had those restrictions since January 2014. Tr. 960.

Regarding Dr. Kent, the ALJ explained:

> The undersigned has given **minimal** [weight] to the work-related restrictions described in the letter dated August 9, 2016 sent to Dr. Robert Kent. The letter asked Dr. Kent to confirm his opinions regarding the claimant's medical condition and the causal relationship of the injury sustained in June 2013 (Exhibit 18F). Dr. Kent had opined earlier that the claimant had permanent physical restrictions of no lifting in excess of five pounds on a repetitive basis, lifting a maximum of 15 pounds on an occasional basis, and no prolonged sitting/standing in excess of one hour. Dr. Kent had opined that the claimant was incapable of performing tasks requiring prolonged concentration, focus, executive functions, and/or thought processes based on significant pain levels and effects of medications. Dr. Kent wrote a response that estimated yearly medical costs were unknown as the claimant's pain was still not controlled and he was doing everything he could do and still had significant pain. However, progress notes from Dr. Kent and other providers at the clinic indicate that the claimant's pain was "greatly reduced" due to physical therapy, and the claimant was doing well on pain medication without noted side effects. The claimant exhibited mild pain with motion of the cervical spine and active pain-free range of motion, normal upper and lower extremity strength bilaterally, and normal memory and orientation. Dr. Kent referred the claimant to the Spine Sports and Pain Medicine clinic in 2017, where he exhibited 5/5 muscle strength in all major muscle groups and in the upper and lower extremities, and normal sensation. Thus, the work related limitations identified by Dr. Kent are inconsistent with clinical examinations, reported benefits from prescribed pain medications and other treatment modalities, daily activities, and the record as a whole.

Tr. 24 (internal citations omitted).

Regarding Dr. Flinchbaugh, the ALJ explained:

The undersigned has considered the limitations identified in a "Physical Residual Functional Capacity" questionnaire by treating physician, Dr. John Flinchbaugh, M.D., dated March 21, 2018 …. Dr. Flinchbaugh opined that the claimant's pain and other symptoms are severe enough to frequently interfere with his attention and concentration needed to perform even simple work tasks. Dr. Flinchbaugh indicated that the claimant is able to lift and carry less than 10 pounds, sit for only 10 minutes at one time and stand for 10 minutes at one time, and sit, stand, and walk for a total of less than two hours total during an eight-hour workday. Dr. Flinchbaugh opined that the claimant must take unscheduled breaks every 15 to 20 minutes and rest for 30 minutes before returning to work, and he would have to lie down at unpredictable times during the day because of pain. Dr. Flinchbaugh opined that the claimant is limited to never looking down, up, right, or left on a sustained basis. Dr. Flinchbaugh opined that the claimant is able to use his left upper extremity to grasp, finger, and reach for only 25% of the workday. Dr. Flinchbaugh opined that the claimant would miss more than four days of work per month because of his impairments or treatment. Dr. Flinchbaugh indicated that the claimant would not be able to maintain a regular work schedule because of medication side effects.

The undersigned has given **partial weight** to Dr. Flinchbaugh's medical opinions when assessing the [RFC], as the limitations are inconsistent with objective medical evidence and other evidence in the record. Dr. Flinchbaugh indicated that the claimant has had these restrictions since January 2014, but he acknowledged in his questionnaire that he began treating the claimant only in May 2017. The claimant presented to Dr. Flinchbaugh in 2017 at the Florida Spine Care clinic for treatment of neck pain and injections for shoulder pain. According to Dr. Flinchbaugh's progress notes from September 2017, the claimant had a "functional benefit" from prescribed medications and continued the treatment plan. The objective examination of the claimant found normal gait and intact sensation. The claimant reported continuing pain but 80 percent pain relief from SI injection without side effects. Other progress notes refer to the claimant's medication working well and controlling pain without side effects. The claimant returned to the clinic for follow-up and refills of medications noted to be working well and controlling pain without side effects and problems. According to progress notes from December 2017, the claimant indicated overall decreased pain and improved functional capacity. A left shoulder cortisone injection provided more than 75% relief. Clinical examinations

continued to reflect normal sensation, gait, and strength. Given the evidence as a whole and applying the factors used to weigh opinions pursuant to Social Security regulations, the undersigned has given weight to Dr. Flinchbaugh's opinion to the extent of the [RFC].

Tr. 23–24 (internal citations omitted).

The ALJ gave great weight to the opinions of state-agency medical consultant James Mabry, M.D., stating:

> [T]he undersigned has given great weight to the opinions of State agency medical consultant, Dr. R. James Mabry, M.D., that the claimant has the capacity to perform physical work activities in the light range and stand and/or walk for a total of no more than four hours of an eight-hour workday (Exhibit 3A). Dr. Mabry opined that the claimant had additional nonexertional postural and manipulative limitations due to pain. Dr. Mabry indicated that the claimant is limited to frequent reaching overhead and in front and/or laterally with the right upper extremity secondary to cervical radiculopathy, and frequent fingering with the left hand secondary to left thumb joint fusion. Findings of fact made by State agency medical consultants are treated as expert opinion evidence of non-examining acceptable medical sources, and their opinions are entitled to weight only insofar as they are supported by evidence in the case record, the consistency of the opinions with the record as a whole, and the explanation provided by the consultants (20 CFR 404.1527). Dr. Mabry explained that he based these limitations on the claimant's neck, back, hip, knee, and shoulder pain, and provided narrative analysis of the medical evidence to support these limitations. Dr. Mabry considered the claimant's cervical spine fusion surgeries, left thumb IP joint fusion arthritis, and steroid injections. Dr. Mabry explained that he considered MRI examinations of the claimant's lumbar spine, clinical examination showing antalgic gait with some left foot drop, activities of daily living such as walking a pet dog and independently doing personal care with difficulty, and no specific medication for migraine pain. Dr. Mabry's findings are consistent with the general course of the claimant's medical treatment history since the reconsideration determination, and the updated medical evidence[] documenting normal gait and station, normal sensation, normal reflexes, and normal bilateral upper and lower extremity strength (Exhibit 29F, page 4, 7, 10, 13, 16, 22, 28).

Tr. 22–23.

Regarding Dr. Kent, the ALJ explained the weight he was giving the opinion (minimal) and the reasons for that weight ("inconsistent with clinical examinations, reported benefits from prescribed pain medications and other treatment modalities, daily activities, and the record as a whole," Tr. 24). Those reasons constitute good cause to reject a treating physician's opinion, *see Phillips*, 357 F.3d at 1240–41, and substantial evidence supports them. The ALJ cited these examples to support his reasoning: "Progress notes from Dr. Kent and other providers at the clinic indicate that the claimant's pain was greatly reduced due to physical therapy, and the claimant was doing well on pain medication without noted side effects (Exhibit 22F, page 18 [Tr. 740]; 24F, page 1, 7, 12 [Tr. 766, 772, 777])."; "The claimant exhibited mild pain with motion of the cervical spine and active pain-free range of motion, normal upper and lower extremity strength bilaterally, and normal memory and orientation (Exhibit 24F, page 20 [Tr. 785])."; and "Dr. Kent referred the claimant to the Spine Sports and Pain Medicine clinic in 2017, where he exhibited 5/5 muscle strength in all major muscle groups and in the upper and lower extremities, and normal sensation (Exhibit 25F, page 3, 6, 9 [Tr. 811, 814, 817])." Tr. 24.

Regarding Dr. Flinchbaugh, the ALJ explained the weight he was giving the opinion (partial weight) and the reasons for that weight ("the limitations are inconsistent with objective medical evidence and other evidence in the record," Tr. 23). Those reasons constitute good cause to reject a treating physician's opinion, *see Phillips*, 357 F.3d at 1240–41, and substantial evidence supports them. The ALJ cited these examples to support the reasons for giving partial weight to Dr. Flinchbaugh's opinion: "Dr. Flinchbaugh indicated that the claimant has had these restrictions since January 2014, but he acknowledged in his questionnaire that he began treating the claimant only in May 2017 (Exhibit 30F, page 1 [Tr. 956])."; "The claimant presented to Dr. Flinchbaugh in 2017 at the Florida Spine Care clinic for treatment of neck pain and injections for shoulder pain (Exhibit 27F [Tr. 859–94]) … According to Dr. Flinchbaugh's progress notes from September 2017, the claimant had a 'functional benefit' from prescribed medications and continued the treatment plan (Exhibit 27F,

page 21 [Tr. 879])."; "The objective examination of the claimant found normal gait and intact sensation. The claimant reported continuing pain but 80 percent pain relief from SI injection without side effects. Other progress notes refer to the claimant's medication working well and controlling pain without side effects (Exhibit 28F, page 3 [Tr. 897])."; "The claimant returned to the clinic for follow-up and refills of medications noted to be working well and controlling pain without side effects and problems (Exhibit 29F, page 4, 13, 16, 19 [Tr. 930, 939, 942, 945])."; "According to progress notes from December 2017, the claimant indicated overall decreased pain and improved functional capacity (Exhibit 29F, page 14 [Tr. 940])."; "A left shoulder cortisone injection provided more than 75% relief (Exhibit 29F, page 7 [Tr. 933])."; and "Clinical examinations continued to reflect normal sensation, gait, and strength (Exhibit 29F, page 4, 7 [Tr. 930, 933])." Tr. 23–24.

Other information from the records cited by the ALJ supports the ALJ's treatment of the opinions. *See, e.g.*, Tr. 737–40 (March 2016 visit with Dr. Kent's office; the provider reported moderate pain with motion on a musculoskeletal exam, somatic dysfunctions of the upper cervical complex, a normal straight-leg-raise exam, and pain of 6/10; the provider ordered a trial of Norco for pain and observed, "Pain has greatly reduced due to physical therapy,"); Tr. 782–86 (September 2016 visit with Dr. Kent's office; the provider reported neck pain of "mild severity," mild pain with motion in the cervical spine on a musculoskeletal exam, limited range of motion in the lumbar spine, normal strength for upper and lower extremities, and pain of 3/10; the provider reported that Larson stated cervical facet joint injections provided more than 50 percent relief and Gabapentin was helping); Tr. 766–68 (February 2017 visit with Dr. Kent's office; the provider assessed postlaminectomy ["failed back"] syndrome, noted Larson was "doing well on Nucynta ER and Norco, which allow for improvement of functional mobility and higher tolerance for activities of daily living," reported 7/10 pain, and documented a tender cervical spine with mildly reduced range of motion on a musculoskeletal exam); Tr. 912–914 (May 2017 visit with Dr. Flinchbaugh's office; provider reported pain of 4-5/10, normal tone and 5/5 muscle

strength on a neurologic exam, normal gait and posture, and spasm and trigger points in the upper extremities; provider recommended continuing current treatment with no surgery); Tr. 933–35 (January 2018 visit with Dr. Flinchbaugh's office; provider reported that Larson stated Percocet and Robaxin control the pain, "the pain level comes down to 4 on the scale of 10," and a left-shoulder cortisone injection provided more than 75 percent relief; the provider reported no antalgic gait, tenderness in C5-C6 without radicular pain into the upper extremities, and a decreased range of motion in the cervical spine).

And, as the Commissioner observes, Doc. 16 at 8–9, the opinions of Dr. Mabry further support the ALJ's decision.

Larson's first three arguments concern the ALJ's asserted failure to consider certain factors under 20 C.F.R. § 404.1527(c) in determining the weight to give Dr. Kent's and Dr. Flinchbaugh's opinions. Doc. 15 at 7–11.

Larson argues the ALJ discussed Dr. Kent's and Dr. Flinchbaugh's opinions in isolation without acknowledging their consistency in that they each offer a more restrictive RFC than the ALJ found. Doc. 15 at 8.

This argument is unpersuasive. An ALJ need not explicitly address each factor under § 404.1527(c), *see Lawton*, 431 F. App'x at 833. The "consistency" factor to which Larson refers explains, "Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the SSA] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The ALJ considered consistency, found the opinions were inconsistent with the record (including other objective medical evidence), and substantial evidence supports that finding, as discussed above.

Larson argues the ALJ "gave no obvious consideration" to the status of Drs. Kent and Flinchbaugh as treating physicians, citing the regulation that states, "When the treating source has reasonable knowledge of [a claimant's] impairments, [the SSA] will give the source's opinion more weight than we would give it if it were

from a nontreating source." Doc. 15 at 8 (citing 20 C.F.R. § 404.1527(c)(2)(ii)). Larson adds, "[T]he ALJ never identified Dr. Kent as a treating source <u>at all</u>, so it is impossible to determine whether he properly considered the Agency's clear preference for his 'unique perspective.'" Doc. 15 at 9 (emphasis in original).

This argument is unpersuasive. While the regulation explains a treating-source opinion will be given more weight than if it was from a non-treating source, an ALJ still may reject the opinion for good cause, *see Phillips,* 357 F.3d at 1240, which the ALJ did here. While the ALJ never identified Dr. Kent as a treating source, nothing in the record suggests the ALJ overlooked that fact; to the contrary, the ALJ cited visits to Dr. Kent's office and provided a detailed explanation for giving the opinion minimal weight. And the ALJ did not completely reject Dr. Flinchbaugh's opinion, instead giving it partial weight, appearing to credit at least some limitations in handling and using the left shoulder. *See* Tr. 19 (limiting Larson to the ability to "frequently handle and finger with the left hand, [and] frequently reach overhead with the right upper extremity").

Larson argues the ALJ "gave no obvious consideration" to the specialties of Drs. Kent and Flinchbaugh in orthopedics or pain management or that they are the only medical sources to give an opinion and who examined Larson. Doc. 15 at 9.

This argument is unpersuasive. The regulation regarding specialization states: "[The SSA] generally give[s] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." Again, nothing prevents the ALJ from giving less weight to an opinion by a specialist or an examining source if the record does not support it.

Larson makes other arguments.

Larson argues the ALJ substituted his own opinion for those of Drs. Kent and Flinchbaugh, stating again that they are the only examining sources to offer opinions. Doc. 15 at 10.

This argument is unpersuasive. As the Commissioner explains, Doc. 16 at 7, the ALJ need not defer to any medical opinion regarding the RFC, *see* 20 C.F.R. § 404.1527(d)(3), and the ALJ does not substitute his own opinion by determining an RFC without adopting all limitations provided in a treating opinion. As discussed, good cause supported by substantial evidence supports the ALJ's treatment of Dr. Kent's and Dr. Flinchbaugh's opinions.

Larson argues Dr. Kent's and Dr. Flinchbaugh's opinions "are not inconsistent with the objective medical evidence or other evidence in the record," Doc. 15 at 11, summarizing most of the physical medical evidence in the record after the alleged onset date, Doc. 15 at 11–20. He argues, "Dr. Kent repeatedly described abnormal findings on his physical examinations, including reduced range of motion and pain in the cervical and lumbar areas, tenderness over the occipital nerve bilaterally and in the scalp muscles, and trigger points in the cervical, thoracic, and lumbar paraspinal muscles; … these objective findings lend support to Dr. Kent's opinion." Doc. 15 at 20.

This argument is unpersuasive. While some records show complaints of more serious pain or other limitations, others do not, substantial evidence supports the ALJ's rationale, and the Court may not reweigh evidence. *See, e.g.*, *Ross v. Comm'r of Soc. Sec.*, No. 18-12083, 2019 WL 6273398, at *5 (11th Cir. Nov. 25, 2019) (unpublished) ("This is not to say that the record does not contain evidence supporting Ross's claims for disability, or that there is not an alternative interpretation of the evidence that is more favorable for him. … [H]owever, there was other sufficient relevant evidence for the ALJ to conclude that Dr. Stewart-Sabin's hearing testimony was inconsistent with her own treatment records[.]").

Larson challenges the ALJ's statement that Dr. Kent's opinion is inconsistent with "reported benefits from prescribed pain medications and other treatment modalities," contending Larson has only received some benefit from medications and treatments; the benefit has been temporary and has never provided total pain relief; and he has reported fluctuating pain levels; and contending these facts do not undermine Dr. Kent's opinion that ongoing pain will affect Larson's ability to perform executive functions and other tasks requiring concentration.[5] Doc. 15 at 21.

This argument is unpersuasive. The ALJ did not find Larson is pain free or in no need of medication. While the ALJ did not adopt all limitations from Dr. Kent's opinion, the ALJ found Larson has a restrictive RFC.

Larson challenges the ALJ's statement that Dr. Kent's opinion was inconsistent with Larson's activities of daily living. Doc. 15 at 21–22. Larson contends his ability to perform daily activities is "not as robust as suggested in the ALJ's recitation," citing reports he often wears pajamas or "lounging clothes," bathes once a week or before a doctor's appointment, buys frozen dinners, uses only a few utensils, has cleaned his apartment three times in two years, performs household tasks in short segments, fills only a grocery-store bag for trash, drives as needed, and only drives 60 miles once or twice a year to visit his aunt.[6] Doc. 15 at 21–22. Larson argues

---

[5]Larson adds a footnote in which he argues the reason for the ALJ's denial of benefits is important because minimal impairment would affect Larson's ability to perform the "highly skilled work" required to perform his past job as an export manager. Doc. 15 at 21 n.5. The Court does not construe the footnote to raise an argument that the ALJ erred in finding Larson could perform his past relevant work (beyond that this could be a consequence of error in considering the medical opinions), particularly given that it is raised in a footnote with no other law. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (A party "abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

[6]The ALJ described Larson's daily activities in this way:

[T]he claimant testified that he lives alone and independently in a RV. The claimant is able to climb the six steps to get into his RV. The claimant is able to dress and care for his personal needs without any assistance or

the ability to perform sporadic daily activities does not mean he can perform fulltime work. Doc. 15 at 22.

This argument is unpersuasive. While Larson adds more detail to the description, the ALJ's summary of daily activities is accurate. The ALJ did not err in finding that Dr. Kent's restrictions of lifting 15 pounds on an occasional basis, no prolonged sitting or standing in excess of 1 hour, and an inability to perform tasks requiring prolonged concentration, *see* Tr. 716, are inconsistent with a reported ability to care for oneself on a daily basis without help. And the ALJ did not rely solely on Larson's ability to perform daily activities to find no disability—that was one consideration among many.

Larson argues the ALJ could have re-contacted either doctor, have a medical expert review the testimony, or arrange a consultative exam instead of relying on his "lay analysis" to deny benefits. Doc. 15 at 23.

This argument is unpersuasive. As explained, the ALJ did not substitute his opinion for those of Drs. Kent and Flinchbaugh. The evidence was sufficient for the ALJ to make a decision, and the ALJ therefore did not have to recontact the doctors or seek another opinion.

---

reminders. The claimant can make a bed with some difficulty, take out his garbage, cook mostly with a microwave, vacuum, wash dishes, wash clothes, shop for groceries, and drive 60 miles at a time. The claimant testified that he enjoys coin collecting. Progress notes indicate that the claimant did not need assistance in bathing, cooking, dressing, driving, and shopping, and needed minimal assistance from others with housekeeping. While the claimant testified about lying down during a significant portion of his day, progress notes do not show that the claimant informed a treating physician of this level of dysfunction, at least not on a persistent basis.

Tr. 22.

## B.     Larson's Testimony

Larson contends the ALJ failed to properly evaluate his testimony on pain and other limitations. Doc. 15 at 23–25.

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine whether there is an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptom arising from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom.[7] *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the objective medical evidence does not confirm the alleged severity of a claimant's symptom, but an impairment can be reasonably expected to cause that alleged severity, an ALJ must evaluate the intensity and persistence of the alleged symptoms and their effect on ability to work. 20 C.F.R. § 404.1529(c)(1). In doing so, an ALJ must consider all available evidence, including objective medical evidence, statements from the claimant and others, and any prior work history. *Id.* § 404.1529(c)(2)–(3). An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." *Id.* § 404.1529(c)(4). If an ALJ discredits a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, such as pain, he must provide "explicit and adequate reasons for doing so." *Holt*, 921 F.2d at 1223.

---

[7]Effective March 28, 2016, Social Security Ruling ("SSR") 16-3p rescinded a previous SSR regarding credibility of a claimant. SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (republished). The SSR removed "credibility" from policy because the regulations do not use that term. *Id.* The SSR clarified that "subjective symptom evaluation is not an examination of an individual's character" and provided a two-step evaluation process. *Id.* Because the ALJ issued his decision on June 18, 2018, the new SSR applies here. *See Hargress v. Soc. Sec. Admin.*, 883 F.3d 1302, 1308 (11th Cir. 2018) (holding new SSR did not apply when ALJ issued decision before the SSR effective date).

The ALJ summarized Larson's testimony at a hearing about his limitations. Tr. 20. The ALJ then explained:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent.

The alleged severity and persistence of chronic neck and back pain is consistent to a certain degree with the objective medical evidence and the claimant's medical treatment history. The claimant has a well-documented medical history of neck pain and low back pain, and cervical spine surgeries in August 2010 and January 2014. Cervical spine x-rays in April 2014 were interpreted to show stable multilevel spondylosis with stable cervical fusion without evidence of hardware failure or fractures. Lumbar spine x-rays in February 2016 were interpreted to show multilevel spondylosis with prominent left-sided paracentral disc extrusion at L4-5 and displacement of nerve roots (Exhibit 17F, page 3). The claimant received lumbar and cervical injections and treated his symptoms with narcotic pain medications, physical therapy, and surgical interventions. Medical treatment records show that the claimant reported continuing pain while receiving refills of prescribed medications, which lends some support to the claimant's statements.

Tr. 21.

The ALJ continued:

The evidence of the claimant's activities of daily living seems to be more consistent with the above [RFC] than with the allegation of disabling chronic pain. For example, the claimant testified that he lives alone and independently in a RV. The claimant is able to climb the six steps to get into his RV. The claimant is able to dress and care for his personal needs without any assistance or reminders. The claimant can make a bed with some difficulty, take out his garbage, cook mostly with a microwave, vacuum, wash dishes, wash clothes, shop for groceries, and drive 60 miles at a time. The claimant testified that he enjoys coin collecting. Progress notes indicate that the claimant did not need assistance in bathing, cooking, dressing, driving, and shopping, and needed minimal assistance from others with housekeeping. While the claimant testified about lying down during a significant portion of his day, progress notes

do not show that the claimant informed a treating physician of this level of dysfunction, at least not on a persistent basis.

After considering the claimant's subjective complaints, objective medical evidence, medical treatment history, daily activities, and the record as a whole, the undersigned finds that the claimant has a capacity for a range of light physical exertional work activities. The record shows the claimant has chronic neck pain, head pain and nerve damage, lateral shoulder pain, and low back pain, while taking potent pain medications, including Oxycodone, Mobic, and Meloxicam. The claimant has a history of cervical spine surgeries, physical therapy, and injections. The nature and effect of chronic pain limits the claimant's postural activities within the [RFC]. However, the alleged intensity and persistence of pain is inconsistent with physical examinations and improvement noted by the claimant's medical treatment providers following surgical intervention. The weight of the evidence suggests that the claimant can tolerate basic work-related activities within the parameters of the [RFC]. Further, the assessment of environmental limitations in the [RFC] takes into account the claimant's asthma without reports of acute harshness of breath or wheezing.

Tr. 22 (internal citation omitted).

The ALJ added:

In sum, the … [RFC] assessment is supported by the nature and effects of the claimant's diagnosed impairments and related symptoms of chronic neck, back, shoulder, hip, and head pain. The objective medical findings, diagnoses, documented complaints of chronic neck pain and back pain, and attempts to evaluate symptoms lends support to the claimant's testimony. However, there appears to be minimal objective medical evidence over the longitudinal basis to support greater limitations. The claimant's treatment history and noted effectiveness of prescribed medications, the inconsistencies between testimony and physical examinations, the objective medical evidence, and work activity support the above-adopted range of light exertion.

Tr. 24.[8]

---

[8]Included in a recitation of medical evidence, the ALJ also observed, "The claimant testified that he has severe head pain that limits him to reading for only 30 minutes secondary to his head injury in 2013. However, the claimant continued to work at his

Larson argues the ALJ failed to account for his strong work history. Doc. 15 at 24. Larson contends he worked for the same company for 29 years; earned more than $100,000 a year for the last 15 years; and continued to work after his head injury until he could no longer do so. Doc. 15 at 24. He contends the ALJ had to consider his work history, stating someone likely would not give up a lucrative career to receive disability benefits. Doc. 15 at 24 (citing, in part, *Lafond v. Comm'r of Soc. Sec.*, No. 6:14-cv-1001-Orl-DAB, 2015 WL 4076943, at *9 (M.D. Fla. July 2, 2015) (unpublished)). He explains his work history does not entitle him to enhanced credibility, but the ALJ had to consider it under the regulation and did not. Doc. 15 at 25.

This argument is unpersuasive. The ALJ partially credited Larson's testimony, finding it "consistent to a certain degree with the objective medical evidence and … medical treatment history," Tr. 21. The ALJ cited Larson's work history, *see* Tr. 25, and considered it, though in a neutral or unfavorable way, to observe that Larson continued working for at least two years after his head injury, *see* Tr. 22 and footnote 10. Though Larson's work history could have supported giving more credence to his testimony, substantial evidence supports the ALJ's findings, as discussed, and the Court is without authority to reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *See Moore*, 405 F.3d at 1211.[9]

---

skilled job (SVP level of 8) through August 2015, two full years after the alleged head injury." Tr. 22.

[9]To the extent Larson relies on *Lafond*, the Court observes it is a nonbinding case and involved other errors warranting remand. *See Lafond*, 2017 WL 4216467, at *5–9.

## IV. Conclusion

The Court **affirms** the Commissioner's decision and directs the clerk to enter judgment for the Commissioner and against Randal Larson and close the file.

**Ordered** in Jacksonville, Florida, on March 23, 2020.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:    Counsel of record